UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

IN THE MATTER OF THE SEARCH
OF ONE WHITE APPLE IPHONE IN THE
POSSESSION OF UNITED STATES BORDER
PATROL IN RICHFORD, VERMONT

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David T. Palczewski, being duly sworn, state as follows:

### Introduction and Agent Background

1.      I am a Border Patrol Agent (BPA) of the United States Border Patrol (USBP), a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been so employed since February 5, 2009. I have been assigned to the Richford, Vermont Border Patrol Station (Richford Station) as a BPA for approximately 3 years and currently serve as the station's Intelligence Agent. I was previously assigned to the Calais, Maine Border Patrol Station as a BPA for approximately 10 years and to the Santa Teresa, New Mexico Border Patrol Station for approximately 1 year.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an Apple iPhone — further described below and in Attachment A — that is currently in the possession of the USBP, and the seizure from the device of the electronically stored information described in Attachment B. This warrant application arises from the United States Border Patrol's contact with Joel Gil Garcia ("GIL"), a citizen of the Dominican Republic, on March 24, 2024 in the District of Vermont. The contact concerned the attempted transportation of aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who

1

had illegally entered the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 8 U.S.C. § 1324(a)(1)(A)(v)(II).

3. The device to be searched is a white Apple iPhone device (hereinafter the "GIL DEVICE"). The GIL DEVICE was seized from the person of GIL on March 24, 2024. The GIL DEVICE is currently in evidence storage at the Richford Border Patrol Station, which is located at 1668 St. Albans Road in Richford, Vermont.

4. Based on my training and experience, the GIL DEVICE has been stored in a manner such that the data on it will have remained intact and in the same condition as it was at the time of the GIL DEVICE'S seizure. The applied-for warrant would authorize the forensic examination of the GIL DEVICE for the purpose of seizing electronically stored data, particularly described in Attachment B, that would evidence the aforementioned federal offenses of human smuggling and illegal entry that the user of the GIL DEVICE engaged in or aided and abetted.

5. In my experience investigating many human-smuggling cases, I have found that electronic devices such as cellular phones are commonly used to facilitate smuggling events in multiple ways. For example, participants use cellular phones to coordinate transportation in advance of the event and to guide migrants during the event across the border and to the waiting vehicle. In addition, smugglers utilize cellular phones to discuss and receive proof of payment from those being smuggled. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos. Individuals who commit these

2

types of crimes together, or who know about crimes committed by their close associates, may communicate about those crimes through electronic communications that would be stored on a cellular telephone. The communications would be similar to those previously noted. Further information stored in the memories of these communication devices could constitute evidence of criminal activity. The device may also contain GPS or similar location information indicating where the devices have traveled. With their cellular phones, those involved in illegal transportation activity often take photographs or videos of their illegal activities, including maps, associates, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of those cellular phones. Moreover, coordinators often track the migrants' and drivers' positions in real time during a smuggling event, and they exchange verbal and/or non-verbal communications over Wi-Fi and/or cellular networks to help them locate one another. These tasks are frequently necessary in the Swanton Sector generally, and the Richford Station Area of Responsibility (AOR) specifically, because the remote and rural nature of the AOR makes it difficult to arrange meetings at precise times and to navigate to locations unlikely to appear on printed maps.

6. The information contained within this affidavit is based upon my training and experience, my own investigative efforts, and investigation by other law enforcement officers with whom I have spoken or whose reports I have reviewed. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below. The information in this affidavit is meant to set forth probable cause to believe that the violations occurred, and that evidence of them will be found on the GIL DEVICE; it does not necessarily include every fact known to law enforcement about the events described

below. Unless otherwise specified, the statements described in the following paragraphs are related in sum and substance and are not meant to be direct quotations or complete descriptions.

## Probable Cause

7. On March 24, 2024, at approximately 03:15 A.M., a remote camera near Pidgeon Hill Road in Franklin, Vermont took a picture of at least one subject treading through snow in a wooded area north of Route 235 near Pidgeon Hill Road. The remote camera was placed in the location by Border Patrol Agents after they detected multiple groups walking through the woods in this location after illegally entering the United States. Migrants illegally crossing into the United States use this route because it provides concealment from local residents and Border Patrol Agents. This location is about 0.8 miles south of the border between the United States and Canada.

8. The area of Pidgeon Hill Road is a remote, dead end dirt road that terminates near the international border between the United States and Canada. On this road are a few residential homes, a farm, and fields used for farming. There are multiple wooded areas connected by tree lines throughout the area. I am familiar with several smuggling events where migrants used these wooded areas to travel south into the United States.

9. Route 235, also called Morses Line Road, is considered a border road as it parallels the United States border for approximately 3 miles between the Morses Line Port of Entry and Richford Road in Franklin, Vermont. Route 235 is approximately 1 mile south of the border. The primary southbound routes connecting to Route 235 are Route 207 on the west and Route 120 on the east. The typical traffic on this road consists of local residents and those using the Morses Line Port of Entry. This port of entry is open between 8:00 A.M. and 4:00 P.M. During the time of the camera activation, this port of entry was closed.

4

10. There are also two residential dirt roads near the intersection of Pidgeon Hill Road that lead south away from the border. These roads are Dandurand Road and Messier Road. These roads are primarily used by its few residents and farms located in the area. It is not common for vehicle traffic from outside the local area to travel on them. It is not the quickest route out of the area and there are no local stores or places to visit.

11. At approximately 3:30 A.M., BPAs responded to the area of Pidgeon Hill Road and Route 235 to investigate a possible alien smuggling event. This area has frequently been used as a pick-up location for migrants. BPAs positioned themselves to wait for a vehicle to arrive to the area to pick up the migrants. At approximately 4:15 A.M., BPA Daniel Graves drove his unmarked service vehicle along Route 235 and stopped near the Pidgeon Hill Road intersection. BPA Graves wanted to confirm that the migrants were still in the area. While using night vision equipment, BPA Graves saw four subjects in a brushy area just north of Route 235. BPA Graves stopped his vehicle, and at the same time, the migrants got up and began walking toward Route 235. BPA Graves believed that the migrants thought he was the vehicle arriving to pick them up. BPA Graves and Supervisory Border Patrol Agent (SBPA) Wesley Martin then walked into the brushy area, identified themselves as Border Patrol Agents and questioned the subjects as to their immigration status and why they were in the area.

12. BPA Graves and SBPA Martin determined that the migrants had illegally entered the United States from Canada. All the migrants were citizens of Mexico. BPA Graves and SBPA Martin placed the subjects into marked Border Patrol Vehicles to transport the subjects to the Richford Border Patrol Station for further processing.

13. BPA Scott Cousineau had parked his marked patrol vehicle near the intersection of VT-207 (the Gore Road) and VT-235, approximately 2.5 miles west of Pidgeon Hill Road.

During the hour prior to BPA Graves and SBPA Martin questioning the subjects, Border Patrol Agents observed only two vehicles driving in the area. Both vehicles belonged to local residents. After BPA Graves and SBPA Martin began questioning the subjects, BPA Cousineau saw a white Kia drive eastbound from VT-207 onto VT-235 and toward Pidgeon Hill Road. BPA Cousineau followed the vehicle east and saw the license plates were New York plates.

14. BPA Cousineau activated his emergency equipment, the white Kia pulled to the side of the road near Mockingbird Way, approximately .25 miles west of Pidgeon Hill Road. BPA Cousineau approached the white Kia, observed there were two adult males in the vehicle and noticed the passenger had a cell phone with a GPS application on, directing the vehicle to the area near the VT-235 and Pidgeon Hill Road intersection.

15. BPA Cousineau asked for identification of the driver and passenger. The driver provided a New York State Driver's License bearing the name Joel Gil Garcia (GIL). The passenger provided a New York State Driver's License bearing the name Maykel Reyes Castillo (REYES). Both GIL and REYES were residents of Yonkers, New York. BPA Cousineau asked GIL and REYES why they were in the area, and neither GIL nor REYES could provide a valid reason.

16. GIL and REYES were transported to the Richford Border Patrol Station for further processing.

17. At the Richford Border Patrol Station, agents took fingerprints and biographic information from the four Mexican citizens and entered them into the E3 Nextgen fingerprint database. This database returned no match for the subjects having any valid admission documents or applications to enter or remain in the United States.

6

18. During an initial health interview, two subjects presented with indications of frostbite to their feet and lower legs. Richford EMS was called, the subjects were evaluated by medical professionals and transported to Northwestern Medical Center in St. Albans for further care and treatment.

19. GIL's fingerprints and biographic information were also entered into the E3 Nextgen fingerprint database. No previous criminal history was discovered. Immigration records for GIL, who later identified himself as a citizen of the Dominican Republic and a permanent resident in the US, confirmed GIL has had legal permanent resident status since 2018 allowing him to legally enter and remain in the United States.

20. REYES' fingerprints and biographic information were also entered into the E3 Nextgen fingerprint database. No previous criminal history was discovered. Immigration records for REYES, who later identified himself as a citizen of Honduras, confirmed REYES had entered the United States on or about April 18, 2016 and applied for asylum. No final orders of removal have been entered against REYES. REYES has an active application for Permanent Residence.

21. At the Richford Station, REYES was read his *Miranda* rights by BPA Nathaniel Arnold. REYES agreed to give a statement without an attorney present and gave consent to search his cellular device. The interview was conducted with the assistance of a Spanish interpreter.

- REYES stated he and GIL came to the area, visited friends, and were driving back to Yonkers when encountered by Border Patrol. REYES could not describe where the friends lived or what they did while visiting.

- On March 23, 2024 REYES received a text message from Chase Bank confirming a money transfer for $500 from FRANCISCO GARCIA.

7

22. GIL was read his *Miranda* rights by BPA Arnold. GIL did not agree to give a statement without an attorney present and did not give consent to search his cellular device.

23. BPA Arnold interviewed the two Mexican citizens who were not hospitalized. Both individuals were read their *Miranda* rights and agreed to be interviewed without an attorney present and gave consent to searches of their cellular devices. The interviews were conducted with the assistance of a Spanish interpreter.

- One subject stated he communicated with a FRANCISCO LICHI to illegally enter the United States. The subject agreed to pay FRANCISCO LICHI $4,000 USD upon the subject's arrival to New York City.

- The subject said FRANCISCO LICHI instructed all communication between him and FRANCISCO LICHI to be deleted after entering the United States.

- A picture saved on the subject's phone shows a money transfer confirmation appearing to be from the subject to FRANCISCO GARCIA for $1,000 made on or about March 16, 2024.

- The second subject had a contact in his phone labeled FRANCISCO COYO with the same phone number as FRANCISCO LICHI above.

- A picture saved on the second subject's phone showed a money transfer confirmation appearing to be from subject to FRANCISCO GARCIA for $2,500 made on or about March 22, 2024.

**Information Regarding Electronic Storage and Forensic Analysis**

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the DEVICE is used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on

9

other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection, in order to determine whether it is evidence described by the warrant.

### Conclusion and Request

  27. Based on the foregoing, I submit there is probable cause to believe that at the time of his arrest, Joel GIL Garcia attempted to transport aliens in furtherance of their illegal entry while knowingly or recklessly disregarding the fact that they were aliens who had illegally entered the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 8 U.S.C. § 1324(a)(1)(A)(v)(II). Further, there is probable cause to believe that evidence of these violations will be located inside the DEVICE. I respectfully request the issuance of a search warrant authorizing the examination of the DEVICE, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

  28. Because this warrant seeks only permission to examine the DEVICE, which is already in law enforcement's possession, the execution of this warrant would not involve the

physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this _____ day of April, 2024.

_____
DAVID T. PALCZEWSKI
Border Patrol Agent
U.S. Border Patrol

Attested and sworn to before me by reliable electronic means on this 2ⁿᵈ day of April, 2024.

_____
HON. KEVIN J. DOYLE
United States Magistrate Judge